Walworth, Chancellor.
The object of this writ of error appears to be to induce this court to overrule its decision in the case of Coddington v. Bay, (20 Johns. Rep. 637,) and to make our decision conform to the opinion of Mr. Justice Story in the recent case oi Swift v. Tyson, (16 Peters' Rep. 1,) decided by the supreme court of the United States. Upon questions arising under the constitution and laws of the United States, and upon the construction of treaties, the decisions of that high tribunal are binding upon the state courts; and we are bound to conform our decisions to them. But in questions of local law, and in the construction of the constitution and statutes of the state, the decisions of the highest court of judicature of the state are the evidence of what the law of the state is; and are to be followed in preference to those of any other state or country, or even of the United States. On a question of commercial law, however, it is desirable that there should be, as far as practicable, uniformity of decision, not only between the courts of the several states and of the United States, but also between our courts and those of England, from whence our commercial law is principally derived, and with which country our commercial intercourse is so extensive. I have, therefore, thought it my duty to re-examine the principles upon which the decision of this court in Coddington v. Bay was founded, notwithstanding it was deliberately made, with the concurrence of at least one of the ablest judges who has ever adorned the bench of this state, and has been acquiesced in and followed by all the courts of the state for more than twenty years. And I have done it not only out of respect to the decision actually made by the supreme court of the United States in the case alluded to, but also because the opinión of the distinguished judge who pronounced its decision, is of itself entitled to very great weight upon a question of commercial law; although what he said in that case respecting the transfer of a negotiable note as a mere security for the payment of an antecedent debt, was not material to the decision of any question then before the court, and is therefore not to be taken as a part of its judgment in that case.
In Coddington v. Bay, this court did not, so far as I have been able to discover, run counter to any decision which had *96 ever been made in this state or in England previous to that time. For the decision admits that the bona fide holder of negotiable paper, who has received it for a valuable consideration, without notice or reasonable ground to suspect a defect in the title of the person from whom it was taken in the usual course of business or trade, is entitled to full protection. But that where he has received it for an antecedent.debt, either as a nominal payment or as a security for payment, without giving up any security for such debt which he previously had, or paying any money or giving any new consideration, he is not a holder of the note for a valuable consideration, so as to give him any equitable right to detain it from its lawful owner. This principle, of protecting the bona fide holder of negotiable paper who has paid value for it, or who has relinquished some available securi ty or valuable right on the credit thereof, is derived from the doctrines of the courts of equity in other cases where a purchaser has obtained the legal title without notice of the equitable right of a third person to the property. It has been uniformly held by the courts of equity in such cases that the purchaser who has obtained the legal title as a mere security or payment of a preexisting debt, without parting with any thing of value, is not entitled to hold the property as against the prior equitable owner. And if he has paid but a part of the consideration, or value of the property, he is only entitled to be considered as a bona fide purchaser fro tanto. This last principle was applied by one of the courts in England to the purchaser of a negotiable note, where the endorser of a note for £100, by his replication to the plea that it was endorsed to him without consideration, stated that it was endorsed to him for the consideration of £49; and he was only permitted to recover that amount against the defendant, from whom the note had been obtained by the endorser without consideration. (Edwards v. Jones, 7 Car. & Payne, 633.)
It is somewhat singular that Mr. Justice Story should rely upon the opinion of Chancellor Kent in the case of Bay v. Coddington, (5 Johns. Ch. Rep. 54,) as evidence that the decision of this court sustaining his opinion, and affirming his decree in the same case, was a departure from the law of this state as *97 previously settled. And the previous case of Warren v. Lynch, (5 John. Rep. 289,) is not in conflict with the decision of this court; nor does it decide that a pre-existing debt is a sufficient consideration to protect the holder of a negotiable note which was not valid as between the original parties, against the equitable rights of the maker of the note, or against the rights of a previous owner. For the note in that case was given by Lynch for a valid and subsisting debt by the one to whom the debt originally belonged. Although it wag taken in the name of another person, that person endorsed it in blank for the purpose of enabling the person to whom the debt belonged to negotiate it; and it was then transferred to the plaintiff, immediately for aught that appears, partly in payment or security of a preexisting debt. The question then arose whether other creditors of the former owner of the note were not entitled to it, as being still the property of Rose the original owner, or of Robertson the endorser. What is said, therefore, as to the pre-existing debt, is merely as té) its being a sufficient consideration as between the plaintiff and Rose, from whom the plaintiff received the note. For if the transfer was valid as between them, the creditors of Rose, who were also endeavoring to obtain payment of a pre-existing debt merely, acquired no right to the money due on the note, by their subsequent suit in the nature of a foreign attachment in the state of Virginia. The case of Birdseye v. Ray, (4 Hill’s Rep. 159,) cited by the plaintiff’s counsel on the argument, is a case of the same character. For both claimants in that case were endeavoring to obtain preference in payment of pre-existing debts. And the court decided that one of them who had secured a specific lien upon the property by purchase from the owner, before the other creditor’s execution was actual-, ly levied thereon, was entitled to hold it as against the execution, under the provision of the statute on that subject. In other words, that, as between creditors having equal equities, the debtor may lawfully prefer one to the other, before an actual levy upon his property has been made.
There is no doubt that the cases of Wardell v. Howell, (9 Wend. Rep. 170,) Rosa v. Brotherson, (10 id. 85,) On *98 tario Bank v. Worthington, (12 id. 593,) and Payne v. Cutler, (13 id. 605,) in the supreme court of this state, and of Francia v Joseph, (3 Edw. Ch. Rep. 182,) before the vice chancellor of the first circuit, follow the decision of this court m the case of Coddington v. Bay. And they fully establish the principle that to protect the holder of a negotiable security which has been improperly transferred to him in fraud of the prior legal or equitable rights of others, it is not sufficient that it has been received by him merely as a security or nominally in payment of a pre-existing debt, where he has parted with nothing of value, nor relinquished any security upon the faith of the paper thus improperly transferred to him without any fault on his part. I may also add that many other decisions to the same effect have been made in this state, in the different courts of law and equity, within the last twenty years; although most of them have not been reported.
It is supposed, however, by the learned judge who delivered the opinion of the supreme court of the United States in the case before alluded to, that this strong column of decisions, supported as it is by the decree of Chancellor Kent in the case of Bay v. Coddington, by the opinions of Chief Justice Spencer and Justices Woodworth and Platt in that case, and by every judge who has occupied a seat upon the bench of the supreme court since 1822, has been greatly shaken if not entirely overturned by two recent decisions of the supreme court. That the judges who made those two decisions do not themselves so understand them, however, is evidenced by the fact that they have given judgment in the case now under consideration, in conformity with the principle of the decisions which they are supposed to have overruled. And I have not been able to discover any thing in the opinions of the court, as reported, in the cases of The Bank of Salina v. Babcock, (21 Wend. 499,) and The Bank of Sandusky v. Scoville, (24 Idem, 115,) which necessarily conflicts with any previous decision of the supreme court upon the question now under consideration. In the first case, the note was discounted at the bank in the ordinary way. And the proceeds thereof were applied, by the authority of the persons for whom *99 it was discounted, to pay up and cancel three other notes which were then due to the bank; upon two of which notes, amounting to nearly the whole of such proceeds, there was a responsible endorser. The court held that the effect of the transaction was the same as if the parties for whose benefit the note was discounted had actually received the money therefor, and had afterwards applied it to pay and discharge the notes then due; and that the endorser upon those notes was discharged from his liability. In the second case, the question arose under the usury law as contained in the revised statutes, which protects usurious notes in the hands of an endorsee or holder who shall have received the same in good faith, and for a valuable consideration. (1 R. R. 172, § 5.) And the court considered the transaction the same as though the money had been actually paid to the person for whose benefit the usurious note was discounted, and he had then applied it in payment of the former note; so that the original indebtedness was extinguished, and the bank had no other remedy to recover their money except upon the note which was alleged to have been originally tainted with usury. The question in that case was, whether the transaction was equivalent to an actual payment of the money for the usurious note, so as to make the bank a bona fide holder for a valuable consideration; and not whether giving the note for a pre-existing debt was a payment of value. Under a similar provision in the English statute it has been decided that a negotiable note tainted with usury was invalid in the hands of an innocent party, who had merely taken it in payment of an antecedent debt. (Vallance v. Siddell, 2 Nev. & Per. Rep. 78.) There is nothing in the reports of our own state then, which is in conflict with the principle established in Coddington v. Bay in this court, that, to protect the holder of a negotiable security which has been passed to him in fraud of the rights of others, he must not only have taken it without notice, but must also have parted with something of actual value, upon the credit or faith thereof; and that merely receiving it in security or payment of an antecedent debt, where by the settled rules of equity he would not *100 "be protected as a bona fide purchaser of property iri other cases, is not sufficient.
Nbr have I been able to find an actual decision in the English reports which is in conflict with the uniform course of decisions on this subject in this state. On the contrary, the English judges, when speaking on this subject, generally use the words valuable consideration, in contradistinction from a mere valid or sufficient consideration as between eridorser and endorsee. And that receiving the note in payment or security of a preexisting debt merely, is not understood as receiving it for a valuable consideration, in legal lknguáge, is evident from the decision of the case of Vallunce v. Riddell, to which I have just referred.
I think the learned judge was under a mistake in supposing that this question arose in England and was decided in the case of Rose v. Van Meirop, (3 Burr. Rep. 1663.) That was a suit brought against defendants who had actually agreed with the plaintiffs to honor their drafts for money previously advanced by them to a third person. And the only question was, whether the indebtedness of a third person was a sufficient consideration for the written promise of the defendants to accept the bills on his acbount. One of the earliest English cases upon the question which we are considering, is the anonymous case before Chief Justice Holt in 1698; where a bank note payable to bearer was Ibst, and the finder passed it for a valuable consideration. In an action of trover brought by the loser against the person to whom it was thus passed, his lordship decided that the action did not lie against the defendant, because he had the note for a valuable consideration. (1 Ld. Raym. 738; 1 Ralk. 126, S. C.) The next in order of time was the case of The Ex'rs of Devallar v. Herring, in 1727, (9 Mod. Rep. 45;) where an annuity ticket was lost or stolen, and, after passing through several hands, came to Herring, the defendant, who purchased it for a valuable consideration. And it was decided that he was entitled to it, upon the ground that it had come to his hands bona fide, and for a valuable consideration. In Haly v. Lane, (2 Atk. Rep. 181,) which came before Lord Hardwicke in 1741, *101 he thus lays down the rule: “ Where there is a negotiable note, if it comes into the hands of a third or fourth endorsee, though some of the former endorsees might not pay a valuable consideration, yet if the last endorsee gave money for it, it is a good note as to him; unless there should be some fraud or equity against him appearing in the case.” The same principle of protectirig the holder of a negotiable instrument, if received by him in the course of trade, and for a valuable consideration, was recognized in the opinion of the court of king’s bench in 1753, while Chief Justice Lee presided in that court. (Maclish v. Elkins, Say. Rep. 73.) Then followed the case of Miller v. Race, (1 Burr. Rep. 452,) before Lord Mansfield and his associates in 1758, where a bank note was stolen from the mail and came into the hands of the pldintiff, as the report states, for a full and valuable consideration, in the usual course and way of his business, and without ariy notice or knowledge that it had been taken from the mail; but upon presenting it at the bank for payment, it was detained by the defendant, who was a clerk therein. And the decision df the court was in conformity with what is now tindersto'od to be the settled law both in that country Ltid in this. But that Lord Mansfield understood the holder must have given a valuable consideration for the note to entitle him to protection, is evident from what is said in his opinion in answer to a case cited by the defendant’s counsel as having been decided by Lord Holt in 1700. In reference to that case, he says—“ But Lord Chief Justice Holt could never say that an fiction tvould lie againSt a person who, for a valuable consideration, had received a bank note which had been stolen or lost, and bona fide paid to him, even though an action was brought by the true owner; because he had determined otherwise but two years before ; and because bank notes are not like lottery tickets, but money.” And the words “ for a valuable consideration,” as well as “boiia fide paid to him” are italicized in the opinion of Lord Mansfield, to show that both are material and necessary to protect the holder of a note against the claim of the former owner thereof. This is also in accordance with what he actually did in the case of Grant v. Vaughan, (1 Wm. *102 Black. Rep. 485, 3 Burr. 1516, S. C.,) which was tried before him six years afterwards. There a bill of exchange payable to-bearer was Lost, and was found by a stranger to the plaintiff, who-gave it to the plaintiff upon the purchase of a parcel of teas, and received the change, after the plaintiff had made inquiry and ascertained that the drawer of tire bill was a responsible person. And Lord Mansfield submitted it to the jury to decide, 1st. Whether the plaintiff came by the bill bona fide for a valuable consideration? and 2d. Whether such bills payable to bearer were negotiable ? The jury having found a verdict for the defendant, a new trial was granted; not upon the ground that the first direction was wrong, but because his lordship had erred in submitting the question as to the negotiability of such a bill to the jury, as a question of fact. And in answering the objection raised by counsel to the negotiability of drafts payable to bearer, that it would be dangerous because upon a casual loss the finder might maintain an action upon them as bearer, he again says—“but the bearer must show it came to,him bona fide and upon valuable consideration.” The next case was that of Peacock v. Rhodes, (2 Doug. Rep. 633,) which came before the same court in 1781, while Lord Mansfield still presided there. In that case a suit was brought against the drawers of a bill which had been endorsed in blank and was stolen, and had been passed to the plaintiff by a stranger professing to be the owner thereof, for its value, in payment of cloth and other articles in the way of the plaintiff’s trade as a mercer, and partly for cash. And the case was decided in conformity with the previous decisions. But I do not find an intimation in this, or in either of the previous cases, that if the person who received the note or bill had merely taken it in payment or security of an antecedent debt, without having parted with any thing of value on the credit or faith thereof, he would have been entitled to-hold the note or bill against the former rightful owner. On the contrary, we may infer what Lord Mansfield’s opinion would have been upon the question of applying it in payment of a precedent debt, from what he actually decided in 1777, in the case of Buller v. Harrison, (Cowp. Rep. 565.) There, money had *103 been paid to an agent under a misapprehension of facts, and had been passed by him to the credit of his principal, in satisfaction of a previous indebtedness, before he had any notice or suspicion that the money was not justly and equitably due to such principal. And his lordship decided that the agent must refund the money, and. resort to his principal to recover what was due to him before the money was so applied; that as no new credit was given he had not been legally prejudiced; and that applying the money to pay the precedent debt, was not equivalent to paying it over to his principal before he had notice of the plaintiff’s equitable rights.
In the case of Collins v. Martin, (1 Bos. & Pul. 648,) which came before the court of common pleas in England in 1797, the bills had been pledged by the plaintiff’s bankers with the defendants upon an advance of money thereon. The only question there was, whether a banker with whom a negotiable security had been deposited for collection could pledge it to a bona fide holder, for money advanced to him on the credit thereof. And it was decided he could. But in that case the principle is again recognized that to protect the holder of a negotiable instrument against the former owner, where it has been fraudulently transferred, he must be a holder thereof for value. For C. J. Eyre says, “ if it can be proved that the holder gave no value for the bill,. then indeed he is in privity with the first holder, and will be affected by every thing which would affect the first holder. And in the case of Lowndes v. Anderson, (13 East's Rep. 130,) which was decided in 1810, the question was, whether the defendants, who gave up a valid security which had been remitted to them in payment of a balance and to meet acceptances for a bankrupt, were answerable to his assignees for money and bills which they had received from a stranger in payment of such security, although it turned out afterwards that such money and bills belonged to the bankrupt; but which fact was concealed from their knowledge by the secret agent employed by him to transact the business. In that case again, the necessity of a valuable consideration is recognized by C. J. Ellenborough. For in delivering the opinion of the court he says, “ it *104 would be a grievous inconvenience if bank notes could be followed, in the manner now attempted, through the hands of bona fide holders for a valuable consideration without notice.”
I have carefully examined the several subsequent cases, relied upon in the opinion of Mr. Justice Story in Swift v. Tyson to show that the decisions of the courts in England are in conflict with the settled law of this state upon the question now under consideration; and as I understand those cases, only two of them, and these by implication merely, conflict in any degree with our decisions. I believe I have also examined every reported decision on the subject, down to the present time, in the English reports which have reached this country; though it is possible that some have escaped my researches. And I do not find another case, or dictum, in hostility to the principle as settled by this court in the cqse of Coddington v. Bay. The English cases subsequent to 1810, referred to by Mr. Justice Story as containing a contrary doctrine, are the cases of Bosanquet v. Dudman, (1 Stark. Rep. 1,) Ex parte Bloxham, (8 Ves. 531,) Heywood v. Watson, (4 Bing. Rep. 496,) Bramah v. Roberts, (1 Bing. N. C. 469,) and Percival v. Frampton, (2 Cromp., Mees. & Roscoe, 180.) In the first case it is evident there is a typographical error in substituting the word but for who, in the fifth line of the statement of the case by the reporter. The suit was brought by the endorsees of a bill drawn by Rains upon the defendant, payable to his own order, and endorsed by him; and which had been accepted by the defendant. Clark-son & Co. who were the owners of the bill, and who kept an account with the plaintiffs’ bankers in London, deposited the bill with them as collateral security for such acceptances as they might make, And at the time the bill became payable, on the 5th of February, 1812, the plaintiffs were the holders of it, and had at that time accepted bills to a much larger amount than the cash balance in their hands. They were therefore undoubtedly entitled to hold it as against Clarkson & Co., for the excess of such acceptances beyond the cash balance. But as they held other collateral securities to a considerable amount, when this bill was dishonored they returned it to Clarkson & Co. *105 They subsequently remitted it again to the plaintiffs, requesting them to hold it for Clarkson &. Co., and to place the same to their account when paid ; and the plaintiffs continued to hold the bill until Clarkson & Co. became bankrupts. Upon the trial of the cause the defendant’s counsel was proceeding to cross-examine the witness as to the comparative amount of the cash balance and collateral securities, and the amount of the acceptances on account of Clarkson & Co. at the time the bill fell due; with a view, I presume, to show that the cash and other collateral securities were more than enough to meet all their acceptances, and that they had no lien upon this particular bill at that time, but that it belonged to Clarkson <fc Co. And it was in reference to that cross-examination, as I understand the case, that Lord Ellenborough said he should hold that where collateral securities were placed in the hands of a banker, under such circumstances, all the collateral securities were held for value, whenever acceptances should be made from time to time, upon " the credit and faith of such collateral securities, beyond the cash balance in the hands of the bankers. In other words, that it was immaterial how much the collateral securities amounted to. For if the acceptances which had thus been made on the faith of them, exceeded at any time the cash in hand to meet such acceptances, the bankers were holders of all the collateral securities for value, to secure the payment of the deficiency; and neither the depositors nor their assignees in bankruptcy could claim a return of any part of such securities, or prevent the bankers from collecting the money on them, to meet such • deficiency. This was unquestionably good law, and is not a decision that, where a bill is fraudulently deposited with a banker in payment or security of a pre-existing debt, he is a bona fide holder thereof for value, as against the party defrauded. And if the remark of his lordship in that case meant any thing else, it is impossible to tell from the report what he did mean. For there was no claim or pretence that the bill in question did not be-belong to Clarkson & Co. at the time it was deposited with the plaintiffs and when it fell due; although as between Rains, the drawer and endorser, and the defendant, the acceptor, it was a *106 mere accommodation bill. Whether his lordship was right in holding that the return of the bill to the plaintiffs, after it was dishonored and had been paid to Clarkson & Co. by the drawer, who was in equity bound to pay it, restored the plaintiffs to all their former rights as against the accommodation acceptor, is an entirely different question. And if the reporter is right in his statement of the facts, I think I should have decided, in such a case, that the plaintiffs could not recover against the accommodation acceptor or against Rains the drawer; even if they had paid the whole amount of the dishonored bill, in money, to Clarkson & Co., upon the return thereof. Nothing further, however, is necessary to be said, in reference to this very imperfectly reported case, than that it decides nothing upon the question now under consideration.
In Ex parte Bloxham, Lord Eldon merely decided that where bills and securities are remitted to a banker, by his customer, to meet acceptances which the banker may make from time to time for his customer, such banker, as between him and his customer, has a general lien thereon for the amount of his acceptances for the customer. And that though some of the acceptances had not become due at the time the customer became a bankrupt, the banker was entitled to prove, under the commission, the amount for which he was liable upon the acceptances for the bankrupt. But that in making such proof to cover the acceptances, the proof must be made on the securities upon which the bankrupt’s name appeared, and not upon a cash balance against the bankrupt which did not exist until after the bankruptcy. If there is any thing in that decision which has the least bearing upon the question now under consideration, I am not able to discover it.
In Heyioood v. Watson, the defendant and Morrall were co-partners, and obtained permission to overdraw their account with the plaintiffs, their bankers, from time to time to the extent of £2000 ; for which amount Morralhgave his promissory note to the plaintiffs as collateral security. The next day he received from the defendant, his partner, a note payable to himself or order, for one half of that amount, to meet his note as col *107 lateral security to. the plaintiffs for their advances, and to secure to him the repayment of the defendant’s moiety of such advances, or so much as he should individually have to pay the plaintiffs on account of the firm. The partnership was dissolved about a year afterwards; at which time the plaintiffs had made advances for the firm to the amount of £.1300, which neither of' the partners had paid. Morrall had afterwards transferred the defendant’s note to the bankers. But there was no evidence that he had done so without consideration, or that the plaintiffs knew for what the note was given. And the court held that the plaintiffs were entitled to recover, whether they did or did not know for what the defendant’s note was given. It is true, C. J. Best says, if there was a good consideration between Morrall and the plaintiffs who were ignorant of the circumstances under which Morrall took the note, they were entitled to recover. But it is evident he said this in reference to the legal rule that the endorsee of a negotiable instrument is presumed to have paid value for it, until the contrary is shown; the onus of disproving which, according to the decisions of the English courts, is thrown upon the party contesting the right of the holder, except where the note or bill is proved to have been lost or stolen, or to have been obtained or put in circulation by fraud. What the chief justice said in that case is not even a dictum, much less a decision, in opposition to the principle of law as settled in this state. For there was not a particle of equity in favor of the defendant in that case; as he was legally liable to the plaintiffs as a partner, for the whole amount of their advances, even if his note had been turned out by Morrall on account thereof. And all he had to do was to pay up the amount of his note, and the other £300, if they required it, and then sue Morrall for what he had paid beyond his share.
The case of Bramah v. Roberts came before the court upon questions arising upon the pleadings. The plaintiffs were the endorsees of a bill of exchange drawn and endorsed, by W. Clare for £500, at three months, and accepted by the defendants. To the declaration on this bill the defendants pleaded first, the general issue; secondly, that it was accepted- by them without value, *108 was delivered by one of them to T. Hunt for a special purpose, and that he fraudulently transferred the same to the plaintiffs, with notice of his want of authority, and that there was not any consideration or value given in good faith for the endorsement of the bill to them; and thirdly, that one of the defendants fraudulently accepted the bill, under a power to accept it for all the defendants for a special purpose, for a different purpose from what was intended, and that the other defendants received no consideration or value for such acceptance. To the second plea the plaintiffs replied, in substance, that before the bill became due it was endorsed and delivered to them fairly and bona fide for a good and valuable consideration, that is to say, for moneys advanced by and due and owing to them, the plaintiffs; and without notice of the matters stated in the second plea, or of the want of power on the part of Hunt to transfer the bill on his own account. To the third plea they replied substantially in the same manner, after denying the want of authority of one of the defendants to accept the bill for all of them. The defendants demurred specially to these replications, assigning as causes of demurrer that the plaintiffs had not stated with sufficient certainty what consideration or value was given for the hill, nor when or to whom the moneys were advanced, nor whether they were advanced at the time or had been previously advanced, nor whether the moneys advanced were sufficient to authorize them to recover the whole amount of the bill. The court decided that the third plea was bad, as it only alleged that the defendants were defrauded of the bill and that their acceptance was without consideration; but set up no want of consideration in the negotiation of the bill to the plaintiffs, or notice of the alleged fraud, at the time they received the bill. No question was therefore decided upon the sufficiency of the replication to that plea. As to the replication to the second plea, C. J. Tindal thought it was sufficient: that it was only necessary for the plaintiffs to deny notice of the want of authority of the person from1 whom they received the bill, and aver that it was given to them for a full and valuable consideration; and that the replication was suffi *109 cient to show there was a good consideration. He says, “ if money passed from the present endorsees, it appears to me sufficient, as against the acceptors of a bill of exchange, to allege that the bill was received for money advanced by and due and owing to them,” &c. And after referring to the case of a replication in which an averment that the plaintiff was parson, and took for tithes, was construed in reference to the time of severance, he again says, “ a person of plain understanding will interpret this in the same way, that there has been a money consideration passing from the plaintiffs.” But the chief justice went further, and declared his opinion to be that if the replication had contained a simple denial of the allegation of a want of consideration, it would be sufficient. From his language in this case I should infer that he understood the law to be that the holders of the bill must have received the same for a valuable consideration at the time of the transfer. But I adtiiit that Mr. Justice Park uses the words valid consideration in his opinion. He says, “If the bill of exchange was endorsed and delivered to the plaintiffs for a good and valid consideration, that is to say, for money advanced by and due and owing to the plaintiffs, and they say that at the time it was endorsed -to them they had no notice whatever of the fraud, it must be taken that the bill was taken for some antecedent debt.” From this it may perhaps be fairly inferred that he thought that was sufficient to enable the holder of the note to recover thereon, although no other available security for such antecedent debt was given up or discharged upon the faith and credit of the bill, at the time it was so received by the plaintiffs ; but he does not say so. And Justice Bosanquet says, “ I am disposed to think that the replication would have been quite sufficient if it had not added-the words 1 for money advanced by and due and owing to the plaintiffs,’ thereby setting out the nature of the consideration; but that it was sufficient to say ‘ that after the bill was made, and before it became due and payable, on a specified day, the bill was endorsed and delivered to the plaintiffs fairly and bona fide, and for a full and valuable consideration.” But whatever may have been the opinion of the judges who de *110 cided that case, trader the new rules of pleading in England, and in reference to the fact that under any form of replication which did not admit a want of a sufficient consideration, the onus of proving that the bill was not passed to the plaintiffs for a good and sufficient consideration would be upon the defendants, I think it is not entitled to the weight of a judicial decision upon the question now under consideration.
In the other case, Percival v. Frampton, the defendant had endorsed the note for the accommodation of the maker thereof, to enable him to obtain money thereon generally. And he got it discounted by his banker, who placed the proceeds to his credit, on which he afterwards drew out £198, and the residue was applied to the balance of his account. The court held that this was equivalent to an advance of the money to him. So far the decision was in accordance with the case of The Bank of Rutland v. Buck, (5 Wend. Rep. 66,) and other cases decided in this state. For, the object of the endorsement being to enable the maker of the note to raise money generally, and not for any specific object in which the endorser had an interest, it was wholly immaterial to him whether the note was passed to the credit of the maker with his banker, or the banker advanced him the money on the note and then received it back to make good his account, or the maker received the money from any other person upon the note, and then paid it to the plaintiffs for their debt. But in that case Mr. Baron Parke expresses the opinion that if the note had been given to the plaintiffs as security for a previous debt, and they held it as such, they might be properly stated to be holders for valuable consideration. From which I infer that his opinion corresponds with that of the supreme court of the United States upon the question now under consideration.
The question was raised by the counsel for the defendant in a subsequent case (Bartrum v. Caddy, 9 Adol. & Ellis Rep. 275) that a by-gone debt is not a sufficient consideration to give a fraudulent assignee a title to recover. But as the judgment was given for the defendant upon other grounds, no opinion was expressed by the court of queen’s bench upon that point. *111 And I do not think there is any decision in any court of England directly upon the question.
I have not had leisure to examine the reports of most of our sister states in reference to this subject. But in addition to the case from Connecticut referred to in the opinion of the court in Swift v. Tyson, there are two decisions in. the state of Maine, (Homes v. Smyth, 4 Shepl. Rep. 177, and Norton v. Waite, 2 Appl. Rep. 175,) in which it was held that the holder of a negotiable security who had received it in absolute payment of a pre-existing debt, without notice, was entitled to recover thereon, notwithstanding any failure or want of consideration, or other equities previously existing between other parties. But as I understand the opinion of Judge Shepley in the first of those cases, a party who takes a note or bill as collateral security for the payment of such a debt, and not in absolute payment and discharge of the same, will not be entitled to protection in that state against the rightful owner.
The decision of the supreme court of Pennsylvania in Petrie v. Clark, (11 Serg. & Rawle, 377,) appears to be in accordance with the opinion of Judge Shepley in Homes v. Smyth. For Judge Gibson, who delivered the opinion of the court, says, if the note had been delivered in discharge of the debt, there would be no difficulty in saying, in the absence of collusion, that taking it in the usual course of business, as an equivalent for a debt which is given up, would be a purchase of it for a valuable consideration. But as it was given in pledge, for securing an antecedent debt, which was not discharged, but suffered to remain, and as it does not appear that money was advanced, or any act done that would in law be a present consideration, the case presented was against the plaintiff.
In the case under consideration, the notes which were improperly transferred by Gillespie in fraud of the rights of the owners, were not received by the plaintiff in error in payment or discharge of his debt, but as mere collateral securities for the payment thereof. He therefore would not be entitled to protection as a bona fide holder, for a valuable consideration, according to these decisions in the courts of our sister *112 states. Nor do I think that the settled law of this state is so manifestly wrong as to authorize this court to overturn its former decision for the purpose of conforming it to that of any other tribunal, whose decisions are not of paramount authority.
I must therefore vote to affirm the judgment of the court below.
Lott, Senator.
As a general rule the true and rightful owner of property is entitled to recover it from any person in whose possession it may be, whether obtained by the latter under color of a purchase or otherwise. An exception, however, founded on principles of commercial policy, has been made in favor of the holder of negotiable paper, received in the usual corase óf trade, for a valuable consideration, though from a person having no right to make the transfer, and without notice of the fraud. Under such circumstances the right of the holder is allowed to prevail against the claim of the previous owner.
To bring a case within the exception, it is not enough to show that there was a consideration for the transfer, sufficient as between the holder and the party transferring, but the consideration must be such as the law denominates a valuable one. In' Coddington v. Bay, (20 Johns. R. 637,) a case decided by this court in which the principle of the exception was fully discussed, Mr. Justice Woodworth said, something must have been paid in money or property, or some existing debt satisfied, or some new responsibility incurred in consequence of the transfer; this would be paying value, and making out a consideration within the reason and meaning of the rule.” (Id. 646.) Chief Justice Spencer there remarked, “ I understand, by the usual course of trade, not that the holder shall receive the bills or notes thus obtained, as securities for antecedent debts, but that he shall take them in his business, and as payment for a debt contracted at the time.” (Id. 651.) Mr. Senator Vielie observed that, “ though indemnity for responsibilities is undoubtedly a good consideration for the sale or transfer of goods or negotiable .paper, as against the party making it or his representatives, yet in none of the cases cited on the argument, and *113 in. no one that I have been able to find, has it ever been held to bar the true owner, upon a fraudulent transfer.” (Id. 653.) He added: “ The true test 1 take to be, that when the holder is left in as good a condition, after a retransfer, as he would have been had no transfer taken place, there the title of the owner shall prevail. This allows the rule, so far as it is dictated by commercial policy, to have its full effect, while it protects the owner of negotiable paper, necessarily intrusted in the course of business to the care of agents, from an injury revolting to every principle of moral equity.” (Id. 657.)
If these doctrines are applicable to the case under consideration, and are to guide our decision, it appears to me the right of the defendants in error to the notes in question cannot be impeached.
It was contended on the argument, however, that the withdrawing of the note of Gillespie <fc Edwards from the bank, where it had been deposited for collection, caused a loss or prejudice to the plaintiff in error, which formed a sufficient consideration to entitle him to protection. It might be enough to say, in answer to this position, that the whole force of it is rebutted by the verdict of the jury; for under the charge of the court, the verdict must be understood as having found that no consideration was parted with by the plaintiff in error on the credit of the notes in question. • But apart from this view of the case, it appears that the note of Gillespie & Edwards was merely lodged in the bank for collection, and that there were no endorsers to be charged. A protest was therefore unnecessary, and no injury or prejudice in that respect could have resulted from the act of withdrawing it. True, it is said in the testimony that, after the note of Gillespie & Edwards was withdrawn, and before their failure, they paid “ one or more notes in bank, in the regular course of business ;” but the amount of these notes was not shown, nor did it in any manner appear that the note of the plaintiff in error would have been paid had he suffered it to remain in the bank, although one of the firm of Gillespie & Edwards was examined as a witness upon the trial.
It should be remarked also that there was no stipulation or *114 agreement by the plaintiff in error, on withdrawing his note' from the bank, that he would not enforce payment of it. On the contrary, he had still a perfect right to demand its immediate payment, and to enforce his demand by action.
In every view which can be taken of this case, it appears to me the title of the defendants in error to the notes in question has not been divested, and that the judgment of the court below ought to be affirmed.
On the question being put, “ Shall this judgment be reversed 1” all the members of the court present who heard the argument, except Strong, senator, voted for affirming.
Judgment affirmed.